[Cite as *State v. Conway*, 2019-Ohio-382.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                   :

    Plaintiff-Appellee,                      :

                                               No. 17AP-90

v.                                              :      (C.P.C. No. 02CR-1153)

James T. Conway, III,                            :      (REGULAR CALENDAR)

    Defendant-Appellant.                     :

---

D E C I S I O N

Rendered on February 7, 2019

---

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Steven L. Taylor,* for appellee.

**On brief:** *Marc S. Triplett; Carpenter Lipps & Leland LLP,* and *Kort W. Gatterdam,* for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

HORTON, J.

{¶ 1} Defendant-appellant, James T. Conway III ("Conway"), filed a successive petition for postconviction relief under R.C. 2953.21 and 2953.23, challenging his conviction and sentence of death in the Franklin County Court of Common Pleas. The trial court denied the petition and Conway appealed. For the following reasons, we affirm the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} This is the second petition for postconviction relief that Conway has filed in this case. *See State v. Conway*, 10th Dist. No. 05AP-76, 2005-Ohio-6377 (hereinafter "*Conway I.*") We adopt the following summary of the facts of this case from our decision affirming the trial court's denial of Conway's first petition:

> The underlying criminal case against appellant arises from events that occurred on January 18, 2002. On that night, appellant, his brother, Jeffrey Conway, and many others were

involved in a fight at a Columbus club called Dockside Dolls. After club personnel quelled the fight, appellant's brother stated that he had been cut and that Mandel Williams had done it. Thereafter, appellant obtained a .45 caliber weapon and began firing toward Williams. Jason Gervais, a club patron who had not been involved in the fight, walked or was pulled in front of Williams. Gervais and Williams fell to the ground. Gervais was shot three times from behind, and he died from his wounds. Williams also was shot three times, but survived.

A grand jury returned a three-count indictment against appellant. Count 1 charged appellant with the aggravated murder of Gervais and carried a death penalty specification. Count 2 charged appellant with the attempted murder of Williams. Count 3 charged appellant with having a weapon under disability.

A jury trial began on January 17, 2003. On January 31, 2003, the jury returned guilty verdicts on all counts and specifications. On February 6, 2003, the jury returned a verdict recommending that appellant be sentenced to death. On February 18, 2003, the trial court sentenced appellant to death.

*Id.* at ¶ 2-4.

{¶ 3} In a separate case, Conway was also sentenced to death, after being convicted of aggravated murder, kidnapping, possession of criminal tools, abuse of a corpse, obstruction of justice, and tampering with evidence. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815.

{¶ 4} The Supreme Court of Ohio affirmed Conway's conviction and sentence in this case on March 8, 2006. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791 (hereinafter "*Conway II.*")

{¶ 5} Conway filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio on October 7, 2007. The federal court partially overruled the state's motion to dismiss and subsequently authorized several requests for discovery relevant to a number of the grounds of relief presented by Conway's petition. *See Conway v. Houk*, S.D.Ohio No. 2:07-cv-947 (Mar. 31, 2009). The federal court granted Conway's request to conduct records discovery of the original police investigation of the shootings. *Conway v. Houk*, S.D.Ohio No. 2:07-cv-947 (Mar. 17, 2010), at 8. The federal court also granted Conway's request to conduct depositions of a number of

individuals, including the mitigation investigator and his previous trial and appellate attorneys. *Conway v. Houk*, S.D.Ohio No. 2:07-cv-947 (Mar. 17, 2010). After Conway amended the petition, the federal court granted his request to stay the habeas corpus proceedings pending the exhaustion of his claims in state court. *Conway v. Houk*, S.D.Ohio No. 2:07-cv-947 (Mar. 1, 2016).

{¶ 6} Conway then filed a successive petition for postconviction relief in the trial court on July 14, 2016. The state filed a motion to dismiss on August 15, 2016. On January 6, 2017, in an entry that contained findings of fact and conclusions of law, the trial court sustained the state's motion and dismissed Conway's petition without a hearing. (Jan. 6, 2017 Entry.)

{¶ 7} Conway has appealed the dismissal, asserting 12 assignments of error:

> [I.] THE TRIAL COURT ERRED WHEN IT DID NOT DECLARE THE CLEAR AND CONVINCING BURDEN OF PROOF CONTAINED IN R.C. 2953.23(A)(2) CONSTITUTIONALLY INFIRM ON ITS FACE AND AS APPLIED TO CONWAY.
>
> [II.] THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE FIRST GROUND FOR RELIEF AND DENIED CONWAY RELIEF.
>
> [III.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE SECOND AND THIRD GROUNDS FOR RELIEF [] AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.
>
> [IV.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE FOURTH GROUND FOR RELIEF [] AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.
>
> [V.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE FIFTH TO ELEVENTH GROUNDS FOR [] RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.
>
> [VI.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE TWELFTH TO SIXTEENTH GROUNDS FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

[VII.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE SEVENTEENTH GROUND FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

[VIII.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE EIGHTEENTH GROUND FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

[IX.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE NINETEENTH GROUND FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

[X.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE TWENTY-THIRD GROUND FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

[XI.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE TWENTY-FOURTH GROUND FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

[XII.] THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO DISMISS THE TWENTY-FIFTH GROUND FOR RELIEF AND DENIED CONWAY FACTUAL DEVELOPMENT AND RELIEF.

## II. STANDARD OF REVIEW

{¶ 8}    A trial court lacks subject-matter jurisdiction over an untimely or successive petition for postconviction relief unless the petition satisfies the criteria set forth under R.C. 2953.23(A). *State v. Apanovitch*, Slip Opinion No. 2018-Ohio-4744, ¶ 36 ("a petitioner's failure to satisfy R.C. 2953.23(A) deprives a trial court of jurisdiction to adjudicate the merits of an untimely or successive postconviction petition."). Because " 'the question [of] whether a court of common pleas possesses subject-matter jurisdiction to entertain an untimely petition for postconviction relief is a question of law,' " an appellate court applies a de novo standard of review to the trial court's determination. *Id.* at ¶ 24, quoting *State v. Kane*, 10th Dist. No. 16AP-781, 2017-Ohio-7838, ¶ 9.

## III. ANALYSIS

{¶ 9}   "A postconviction proceeding is not an appeal of a criminal conviction, but, rather, a collateral civil attack on the judgment." *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994). The postconviction relief process "is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction." *State v. Murphy*, 10th Dist. No. 00AP-233 (Dec. 26, 2000), citing *State v. Jackson*, 64 Ohio St.2d 107, 413 (1980). Furthermore, the relief available is only "a narrow remedy, since *res judicata* bars any claim that was or could have been raised at trial or on direct appeal." (Emphasis sic.) *Steffen* at 410.

{¶ 10} R.C. 2953.21(A)(1)(a) sets forth a number of circumstances under which a petitioner may seek postconviction relief. Relevant here is the statute's possible grant of relief to a person convicted of a criminal offense "who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." *Id.* The person "may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief." *Id.*

{¶ 11} However, the postconviction relief statute allows only a limited time to file a petition for postconviction relief, which "shall be filed no later than three hundred sixty-five days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication" challenged by the petition. R.C. 2953.21(A)(2). This restriction is jurisdictional, as "a court may not entertain a petition filed after the expiration of" that time period, "or a second petition or successive petitions for similar relief" by the petitioner. R.C. 2953.23(A); *Apanovitch* at ¶ 36.

{¶ 12} The statute grants subject-matter jurisdiction to the trial court to hear a successive petition in only two circumstances. One, which concerns DNA evidence of the petitioner's actual innocence, is not relevant to Conway's petition. R.C. 2953.23(A)(2). The arguably relevant grant of jurisdiction under the statute requires a petitioner to satisfy both of the following:

> (a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which

the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

R.C. 2953.23(A)(1).

## A. First Assignment of Error

{¶ 13} In the first assignment of error, Conway argues that R.C. 2953.23(A) is unconstitutional on its face and as applied to him because its "clear and convincing" standard of proof conflicts with the burdens of proof required to demonstrate violations of federal constitutional rights. Regarding his facial challenge to the statute, Conway argues that these conflicts amount to violations of the Supremacy Clause of the United States Constitution, principles of separation of powers, and the "due course of law" and "open courts" provisions of the Ohio Constitution. (Appellant's Brief at 7-11.)

{¶ 14} We rejected these specific challenges to the statute in our decision affirming the dismissal of Conway's successive petition for postconviction relief from his other death penalty conviction. *State v. Conway*, 10th Dist. No. 12AP-412, 2013-Ohio-3741, ¶ 62, applying *State v. McGuire*, 12th Dist. No. CA2000-10-011 (Apr. 23, 2001). We are bound by our previous holding on these issues, adopt them here, and reject Conway's facial challenge to R.C. 2953.23(A).

{¶ 15} In his "as-applied" challenge to R.C. 2953.23(A), Conway argues as follows:

As applied to Petitioner's case, the statute ignores the complex and evolving body of equitable principles established by judicial decisions. For example, the evidentiary documents presented in support of Conway's petition might not establish by clear and convincing evidence that, but for constitutional error at trial, no reasonable fact-finder would have found Conway guilty of the capital murder or sentenced him to death.

> However, the documents clearly establish a substantial violation of Conway's rights as to render his conviction and sentence void and/or voidable under the United States Constitution. R.C. 2953.21(A)(1). Thus, under the federal standard of review, unencumbered by any need to show that no jury would have convicted him, Conway would be entitled to have his successive post-conviction petition "entertained."

(Appellant's Brief at 12.)

{¶ 16} Conway appears to be arguing that the gate-keeping provision of R.C. 2953.23(A)(1), and, in particular, the prong under subsection (b), acts as an insuperable bar to his ability to obtain postconviction relief under R.C. 2953.21(A)(1)(a). The latter provision entitles a petitioner to relief where "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." R.C. 2953.21(A)(1)(a). Conway believes that "documents clearly establish" such denial. (Appellant's Brief at 12.) However, Conway allows that the same evidence might not satisfy the standard under R.C. 2953.23(A)(1)(b) for successive petitions, which requires him to "show[] by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found" him guilty.

{¶ 17} "A party raising an as-applied constitutional challenge must prove by clear and convincing evidence that the statute is unconstitutional when applied to an existing set of facts." *Simpkins v. Grace Brethren Church of Delaware*, 149 Ohio St.3d 307, 2016-Ohio-8118, ¶ 22. Citing only undefined/unspecified "documents" and no facts, Conway's argument is too imprecise to state a cognizable as-applied challenge to R.C. 2953.23(A)(1). To the extent that his as-applied challenge incorporates the specific arguments made throughout his petition, the question becomes: has Conway identified a particular constitutional violation severe enough to render his conviction void or voidable, yet cannot be reviewed because it fails to clear the jurisdictional bar for successive petitions because the same evidence would not have convinced a jury to convict him?

{¶ 18} Here, however, the question is merely academic. As explained below, Conway has not identified a substantial violation of his rights based on any of the evidence produced by the discovery proceedings in federal court. Accordingly, his as-applied challenge to the statute is without merit, and the first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 19} In the second assignment of error, Conway argues that Ohio's postconviction relief statute provides an "inadequate" remedy for the violation of his constitutional rights, due to its "rigid reliance" on principles of res judicata and a petitioner's inability to conduct discovery until convincing a trial court that a hearing is warranted. (Appellant's Brief at 13-16.)

{¶ 20} This district and other Ohio appellate courts have rejected the "claim that Ohio's postconviction statute does not afford an adequate corrective process." *State v. Hessler*, 10th Dist. No. 01AP-1011, 2002-Ohio-3321, ¶ 73 (collecting cases). It is settled law that the doctrine of res judicata applies when considering a petition for postconviction relief. The application of principles of res judicata in postconviction relief proceedings is necessary to preserve the finality of judgments and the integrity of the appeals process. Furthermore, a petitioner's inability to immediately engage in discovery is a gate-keeping function of the postconviction relief statute, not a deprivation of due process. *Id.* Accordingly, the second assignment of error is overruled.

**C. Third Assignment of Error**

{¶ 21} Conway's third assignment of error asserts that the trial court erred by granting the state's motion to dismiss the second and third grounds for relief in his petition. In these grounds for relief, Conway alleged that his initial trial attorney, Christopher Cicero, had conflicts of interest and provided ineffective assistance of counsel, resulting in a violation of Conway's rights under the Sixth and Fourteenth Amendments. (Appellant's Brief at 17-20.)

{¶ 22} In the petition's second ground for relief, Conway alleged that Cicero operated under a conflict of interest because (1) he represented several witnesses at the time he represented Conway; (2) Cicero disclosed information protected by the attorney-client privilege to officers investigating the shooting; and (3) Cicero himself was under investigation for the murder of Andrew Dotson, whom Conway was convicted of killing, as well as a conspiracy to murder one of the state's witnesses in this case, Brian McWhorter. Conway argued that these conflicts "adversely affected" Cicero's representation of him and "affected the outcome" of the case. (July 14, 2016 Postconviction Petition, hereinafter "petition" at 27.)

{¶ 23} The trial court concluded that Conway had failed to demonstrate prejudice because he "merely [laid] out Cicero's conflicts of interest and a conclusory statement that prejudice resulted." (Jan. 6, 2017 Decision at 10.) The trial court also pointed out it had ordered Cicero's removal as Conway's counsel on June 13, 2002, a date "well in advance of trial." *Id.* In addition, the trial court found that res judicata barred Conway from stating a claim based on Cicero's conflicts of interest because the information concerning his conflicts could have been raised during the first postconviction motion or even the direct appeal. *Id.*

{¶ 24} "Where there is a right to counsel, the Sixth Amendment to the United States Constitution also guarantees that representation will be free from conflicts of interest." *State v. Dillon*, 74 Ohio St.3d 166, 167 (1995), citing *State v. Gillard*, 64 Ohio St.3d 304, 312 (1992). In *Gillard*, the Supreme Court of Ohio set forth the following standard for evaluation of a claim of conflicted counsel:

> Where a trial court knows or reasonably should know of an attorney's possible conflict of interest in the representation of a person charged with a crime, the trial court has an affirmative duty to inquire whether a conflict of interest actually exists. The duty to inquire arises not only from the general principles of fundamental fairness, but from the principle that where there is a right to counsel, there is a correlative right to representation free from conflicts of interest.

*Id.* at syllabus.

{¶ 25} On appeal, Conway argues that the trial court erred, and asserts that four categories of facts support his claim that Cicero operated under a conflict of interest. (Appellant's Brief at 18.) First, he points to evidence that Cicero represented several "potential defendants" in the case: Jimmy Turner, Rickey Turner, and Joe Epling. *Id.* This evidence consists of the police interviews with these individuals, which all took place on January 22, 2002, three days after the shooting. (Petition Ex. No. 2-4.) Each interview summary identifies Cicero as the attorney of each individual and states that he was present during the interview. The summaries do not mention Cicero or describe any interaction he had with the investigating officers, much less one that prejudiced Conway. Furthermore, even if Cicero continued to serve as these individuals' attorney while representing Conway, "multiple representation does not violate the Sixth Amendment unless it gives rise to a

conflict of interest." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Conway does not explain how Cicero's representation of each interviewee created a conflict of interest. Our review of the interview summaries identifies no actions by Cicero that created a conflict.

{¶ 26} Second, Conway argues that Cicero "[d]ivulged information concerning Conway to the prosecution," thereby violating the attorney-client privilege. (Appellant's Brief at 18.) In his petition, Conway points to transcripts of two telephone conversations between Cicero and an assistant prosecutor that took place on May 27 and 29, 2002, and argues that Cicero revealed privileged information. (Petition at 59-62.) In Conway's successive petition for postconviction relief in his other death penalty conviction, he made the same argument. We rejected it for the following reasons, which we adopt here as well:

> In his second petition for post-conviction relief, appellant relies upon the following recently discovered evidence: exhibit No. 6, which is a transcript of a June 12, 2002 interview of Cicero by FCSO officers Floyd and Scott; exhibit No. 7, which is a transcript of a May 29, 2002 interview of Cicero, conducted by prosecutor David DeVillers; and exhibit No. 8, which is a transcript of a telephone conversation between Cicero and DeVillers on an unspecified date. The subject matter discussed in these interviews is the murder of Andrew Dotson.
>
> Appellant claims that he would have moved the trial court to exclude evidence uncovered as a result of Cicero's unauthorized disclosure of privileged information, had he known that Cicero was cooperating with the investigation. Although the recently discovered interview transcripts reveal that Cicero was cooperating with investigators, this fact alone does not establish the existence of constitutional error in the context of his criminal trial. Indeed, as the Supreme Court observed in Conway I, and as this court stated in Conway II, the trial court removed Cicero as counsel for appellant at an early stage of the proceedings. Consequently, counsel's conflict of interest did not manifest itself in deficient performance at trial.
>
> Moreover, even with the benefit of the interview transcripts, appellant does not direct the court's attention to any specific information that was disclosed to investigators in violation of the attorney-client privilege, nor does he identify the specific evidence he would have sought to exclude from his trial. In short, even though the recently discovered interview transcripts establish that appellant's initial trial counsel may have violated attorney-client privilege by cooperating with investigators, appellant has not demonstrated by clear and

> convincing evidence that no reasonable fact finder could have found him guilty absent evidence uncovered as a result of Cicero's cooperation.

*State v. Conway*, 10th Dist. No. 12AP-412, 2013-Ohio-3741, ¶ 21-23.

{¶ 27} Here, the tapes Conway points to have even less relevance, as this petition does not concern his conviction for the murder of Andrew Dotson. Conway specifically points to statements that Cicero made to the prosecution suggesting that Conway would be surprised to discover that a particular individual had not been killed. (Petition at 61.) Notes that the prosecutor made at the conclusion of the transcript indicate that Cicero was cooperating with the prosecution because he believed that "his client [was] out trying to kill witnesses or have someone do it." (Petition Ex. No. 11 at 16.)

{¶ 28} Any statement Conway made to Cicero regarding the potential murder of a witness was not subject to the attorney-client privilege. "A communication is excepted from the attorney-client privilege if it is undertaken for the purpose of committing or continuing a crime or fraud." *State ex rel. Nix v. Cleveland*, 83 Ohio St.3d 379, 383 (1998). An attorney's action of divulging of such information to the state cannot plausibly be asserted as a conflict of interest that prejudices the client, particularly as such an action might save the life of an endangered witness. The argument that Cicero's statement violated any privilege or created a conflict is wholly without merit.

{¶ 29} Finally, Conway argues that Cicero suffered conflicts of interest because Cicero was under investigation for the murder of Andrew Dotson and a conspiracy to kill Brian McWhorter, one of the state's witnesses who ultimately testified against Conway in this case. (Appellant's Brief at 18.) The evidence attached to the petition supporting these allegations includes several interviews with Shawn Nightingale by homicide investigators (Petition Ex. Nos. 13-15.) In a May 28, 2002 interview, Nightingale reported that the night before Andrew Dotson's murder, Cicero had stated to himself and several people in Cicero's office, including Conway, that it would "be a lot easier if" Dotson were "not around," and that he "need[ed] to disappear." (Petition Ex. No. 13 at 2.) In an August 12, 2003 interview with an assistant prosecutor and a homicide detective, Nightingale made the same allegation. (Petition Ex. No. 14 at 14.) A homicide investigation report dated March 14, 2007 stated that Jamie Horton had been interviewed regarding his "past criminal relationship" with Cicero. (Petition Ex. No. 15.) Horton told detectives that he was present at a

conversation in Cicero's office with Conway where Cicero had told them to "eliminate" any persons who had witnessed Conway shoot Jessie James, including Dotson and James. (Petition Ex. No. 15 at 2.) Horton also reported that he had been present at a meeting during which Cicero had told Conway to kill a witness identified as "Brian McCorders" who had seen the shooting at Dockside Dolls. *Id.*

{¶ 30} While this evidence is undeniably troubling, Conway fails to connect Cicero's actions to any identifiable prejudice that occurred during his trial. The fact is that the trial court removed Cicero as Conway's attorney on July 12, 2002, because the state intended to call him as a "material witness." (Jul. 12, 2002 Jgmt. Entry.) This removal occurred well in advance of the January 2003 trial, where other attorneys represented Conway, and he fails to explain in his petition or on appeal how this removal did not satisfy the standard for resolving attorney conflicts of interest set forth in *Gillard*.

{¶ 31} Moreover, at the time the trial court removed Cicero, he was expected to testify about "his meetings with a person by the name of Mr. Horton and conversations therewith pertaining to the killing of witnesses." (July 12, 2002 Jgmt. Entry.) Thus, in addition to a failure to demonstrate prejudice, Cicero's actions were part of the record before trial, and res judicata therefore bars these actions from being raised as grounds for postconviction relief. *Steffen* at 410. Finally, even if Nightingale's statements concerning Cicero were not available until after the trial or only uncovered during discovery conducted in a federal habeas proceeding, they are cumulative evidence of an issue that was present in the trial record before trial even began, as is apparent from the trial court's order removing Cicero as Conway's attorney. For this reason, none of this evidence overcomes the bar that res judicata places on postconviction relief premised on the conflicts of Cicero as Conway's attorney.

{¶ 32} For the foregoing reasons, the trial court did not err when it concluded that res judicata barred the second and third grounds for relief raised in the petition. Accordingly, the third assignment of error is overruled.

### D. Fourth Assignment of Error

{¶ 33} In the fourth assignment of error, Conway argues that the trial court erred by dismissing the fourth ground of relief presented in his petition, in which he asserted that

his due process rights under the Fourteenth Amendment were violated when the prosecution withheld information favorable to his defense. (Appellant's Brief at 21.)

{¶ 34} Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

{¶ 35} Three elements must be met to show a *Brady* violation. *Beuke v. Houk*, 537 F.3d 618, 633 (6th Cir.2008), citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999). First, the evidence must be either exculpatory or impeaching, and therefore favorable to the accused. *Id.* Second, the prosecution must have suppressed the evidence in question, whether intentionally or not. *Id.* Third, the defendant must have suffered prejudice as a result to the suppression. *Id.*

{¶ 36} Conway identifies four categories of undisclosed information that he believes would have been favorable to his defense, each of which we consider in turn.

{¶ 37} First, Conway argues that the prosecution suppressed prior inconsistent statements of Brian McWhorter and Ronald Trent, both of whom testified against him. In his petition for relief, Conway identifies several police reports and interviews with McWhorter during which McWhorter denied seeing Conway in the parking lot of the shooting and denied seeing him with a gun. (Petition at 30-31.) Conway argues that those statements were inconsistent with McWhorter's trial testimony, during which he stated that (1) he saw Conway immediately obtain a gun from the trunk of a car after Conway's brother stated that he had just been stabbed, and (2) he saw Conway lowering his hand with a gun in it after shots were fired. (Petition at 31.)

{¶ 38} The police reports and interviews with McWhorter memorialize two initial interviews conducted with him early on January 24, 2002, during which McWhorter admitted that Conway was at the bar at the time of the shooting but denied knowing any other details. (Petition Ex. Nos. 5, 22 & 23.) A third interview occurred the same day, after McWhorter called the detectives himself and said that he wanted to tell them what really

happened the night of the shooting. During the interview, McWhorter stated that on the night of the shooting, he heard Conway's brother Jeff tell Conway that he had just been stabbed, after which Conway left his view. Thereafter, McWhorter heard gunshots. He told the detectives that he did not see Conway with a gun. (Petition Ex. No. 24.)

{¶ 39} Even if these interviews were not available to Conway because the state withheld them, they do not amount to a violation under *Brady* because they are not inconsistent the statements that McWhorter made at trial. During his testimony, McWhorter stated that he had lied to the detectives during the initial two interviews because he had been "scared." (Jan. 23, 2003 Tr. Vol. X at 1759.) McWhorter was cross-examined about these interviews by Conway's attorney at trial, during which he stated that he went to the police for the third interview after being "jumped" by Conway's friends. (Tr. Vol. X at 1781.) Thus, the interview reports were consistent with McWhorter's testimony and would not have provided grounds for impeaching McWhorter. In addition, even if McWhorter's trial testimony stating that he saw Conway with a gun were inconsistent with a previous statement, such inconsistency could not have prejudiced Conway, who admitted at trial that he fired the shots. *Conway II* at ¶ 19.

{¶ 40} Conway also asserts that a Brady violation occurred because the state withheld a letter from Ronald Trent to prosecutors in which Trent stated that he wanted to testify in exchange for a deal. (Petition at 31.) Attached to the petition is a letter from Trent to the Franklin County Prosecutor dated March 12, 2002, in which Trent states that he has "detailed information on this case" and is "willing to work out a deal with your office." (Petition Ex. No. 26.) According to Conway, this statement was inconsistent with Trent's testimony at trial, where he stated that his motivation for testifying against Conway was "because he laughed at someone else's pain from another killing." (Petition at 31; Tr. Vol. X at 1825.)

{¶ 41} The purported inconsistency cited by Conway would not have had an impeaching effect on Trent at trial. During his testimony, Trent admitted that he went to his initial meeting with the prosecutor hoping to make some kind of deal in exchange for providing information. (Tr. Vol. X at 1830.) In addition, Trent stated that he did make a deal allowing him to obtain work release while in prison in exchange for working with the Franklin County Sheriff's office to gather information. (Tr. Vol. X at 1831). Thus, the letter's

contents were not inconsistent with Trent's testimony, would not have had an impeaching effect, and do not support Conway's claim of a *Brady* violation.

{¶ 42} Second, Conway argues that the state suppressed statements made by eyewitnesses that identified individuals other than Conway as the shooter. (Appellant's Brief at 22.) The statements in question were part of reports prepared by police investigators describing initial leads obtained from interviewing persons who had been at the scene of the shooting, including the surviving victim. (Petition Ex. Nos. 5, 27-38, 41-43.) Many of the witness statements do not identify the shooter by name, and many fit Conway's physical description at the time of the shooting. Conway fails to connect any of these statements to the testimony of particular witnesses whose credibility they would have impeached. Furthermore, none of these statements were exculpatory because Conway, while testifying on his own behalf, admitted to the shooting at trial. Accordingly, we reject the contention that they support his allegation of a violation under *Brady.*

{¶ 43} Third, Conway argues that a *Brady* violation resulted from the prosecution's suppression of evidence that he believes contradicted its theory of the case. (Appellant's Brief at 23.) He again mentions the witness statements, which, for the reasons just discussed, do not demonstrate a *Brady* violation. *Id.*

{¶ 44} Conway also cites to what he describes as "the statement of the security guard" in exhibit Nos. 54-56. A security guard working at an apartment complex next to the bar where the shooting occurred heard gunfire, saw people running, and saw one man get into a silver Chevrolet that he then drove onto the apartment complex premises. He witnessed the car strike another car before the driver got out and ran into one of the buildings. The security guard reported the license number of the car to the police. (Petition Ex. Nos. 55-56.) The police interviewed the person to whom the car was registered, who claimed not to be at the bar that night. (Petition Ex. No. 54.) It is not clear how this report contradicts the state's theory of the case, and Conway does not elaborate on the assertion that it does. Many people were involved in the fight that immediately preceded the shooting, and it is logical that many of them would flee at the sound of shots being fired.

{¶ 45} Conway also cites to a police interview with an employee of the club named Christopher Laney. (Appellant's Brief at 24; Petition Ex. No. 60.) Laney recounts attempting to separate individuals after a physical assault that occurred inside the club,

escorting the victim out, and then witnessing the melee in the parking lot. At that time, an individual who did not match Conway's description pulled what Laney believed to be a gun out of his pocket and pointed it at him. Laney then heard five or six gunshots. (Petition Ex. No. 60.) Once again, Conway does not explain how this information contradicts the state's case. Laney did not state that the man he saw fired the shots he heard. In fact, Laney's narrative suggests that the man he saw did not fire the shots because the encounter with the man holding the gun was nearly contemporaneous with the sound of gunshots and Laney did not report that the man fired the weapon. The interview is merely evidence that another individual besides Conway had a firearm that night. Finally, it must be noted once again that neither Laney's statement nor the security guard's statements exculpate Conway, who admitted to firing the shots that struck the victims.

{¶ 46} In addition, Conway also cites to exhibit No. 61 of his petition with the conclusory assertion that it contains "statements of other witnesses whose statements impeached the prosecution's case." (Appellant's Brief at 24.) The exhibit contains an interview with one witness, Michael Nolasco, conducted on January 19, 2002, who witnessed the shooting and saw the shooter flee in an SUV. It is not clear how Nolasco's statement contradicts the state's case. Troy Ankrum, a bouncer, testified at trial that the shooter and others fled in an SUV. (Tr. Vol. VIII at 1250.) Furthermore, during his testimony, Conway admitted fleeing the scene in a vehicle. (Tr. Vol. XIII at 1250.) Thus, Nolasco's statement appears consistent with the state's case.

{¶ 47} Fourth, Conway cites to the evidence discussed in the previous assignment of error pertaining to his first attorney, Christopher Cicero, and asserts that this evidence was suppressed by the state. Conway does not explain how any of the evidence concerning Cicero was impeachable or exculpatory. For the reasons previously discussed, Cicero's statements were far from exculpatory, and because the state never actually called Cicero as a witness, they could not have been used to impeach him.

{¶ 48} For the foregoing reasons, the trial court did not err when it dismissed the fourth ground for relief in Conway's petition. Accordingly, the fourth assignment of error is overruled.

### E. Fifth Assignment of Error

{¶ 49} In the fifth assignment of error, Conway asserts that the trial court erroneously dismissed the fifth through eleventh grounds for relief in his petition, all of which alleged that he was denied the effective assistance of counsel during his trial. (Appellant's Brief at 25-26.)

{¶ 50} Under the two-pronged test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant must first show that the counsel's performance was deficient by demonstrating that there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Second, the defendant must show that the deficient performance resulted in prejudice, which must demonstrate that the defendant failed to receive a fair trial with a reliable result. *Id.*

{¶ 51} First, Conway argues that his trial counsel was ineffective for failing to conduct a reasonable trial phase investigation. He criticizes their investigation of Ronald Trent because they failed to uncover several allegedly false statements made by Trent during his testimony that he believes could have been used to impeach Trent. The new evidence Conway cites to support this argument consists of transcripts of depositions recently conducted with the attorneys who represented him at trial. (Appellant's Brief at 27.)

{¶ 52} Res judicata applies to this argument concerning several of these statements. Conway argues that Trent perjured himself by stating that the mother of the victim in his case had approved his plea bargain. (Appellant's Brief at 27.) However, we considered this argument in Conway's previous petition. *Conway I* at ¶ 52 (stating that the mother of the victim "admitted on cross-examination that she voluntarily signed a letter stating that she was in agreement with the deal" and rejecting the assertion that her alleged disagreement with the plea deal demonstrated trial counsel's failure to prepare for Trent's testimony).

{¶ 53} Res judicata also applies to Conway's assertion that Trent inaccurately stated the time that Conway arrived at the bar, and that this statement could have been used to impeach Trent if his counsel had reviewed a surveillance videotape that was not admitted into evidence. (Appellant's Brief at 27.) The trial transcript reveals that this matter was addressed at length by Conway's attorney, the prosecutor, and the trial court, and could

therefore have been raised in the direct appeal. (Tr. Vol. XVI at 2771-73.) The purported new evidence on this matter is simply an opinion elicited by Conway's current attorneys from his previous attorneys as to whether it would have had an impeachable effect, and, given the record, is insufficient to overcome the matter being barred by res judicata.

{¶ 54} Conway also argues that Trent inaccurately testified that his brother, Jeff Conway, solicited persons to come to the bar to engage in the parking lot fight, and that Mandel Williams, one of the victims, had actually done so. According to Conway, this fact could have been used to impeach Trent. (Appellant's Brief at 27.) Conway cites no portion of the record to support his assertions that Jeff Conway did not actually ask persons to come to the club and that Williams had done so. Furthermore, even if Williams had asked people to come and participate in the fight, it is unclear why this means that Jeff Conway could not have asked the same of his friends. Finally, even if Conway had cited a portion of the record to support these assertions, they would not have impeached Trent. His actual testimony asserted that Conway had confided in him that Jeff called only Conway and told him to come to the club. (Tr. Vol. X at 1820.)

{¶ 55} Conway also asserts that his counsel was ineffective for failing to uncover another incidence of Trent testifying as an informant, thereby assisting the prosecution in the conviction of a fellow inmate. The revelation of this fact would have had minimal impact on Trent's credibility with the jury. As previously discussed, Trent's motivations for testifying were disclosed to the jury. Conway has presented no new evidence to alter the conclusion we reached when resolving his first petition for postconviction relief; his trial counsel's investigation of Trent was not deficient and could not support a claim of ineffective assistance of counsel. *Conway I* at ¶ 52, 63.

{¶ 56} Conway makes several other arguments concerning his trial counsel's alleged failure to adequately prepare for trial. He argues that they failed to investigate Jeff Conway's belief that his life was in danger the night of the shooting because an individual that had previously attempted to assault him and had made threats was in the parking lot the night of the shooting. (Appellant's Brief at 28.) Conway does not explain the relevancy of this information to his defense. At trial, Conway testified that he shot at Williams after Jeff Conway identified Williams as the person who had just stabbed him. The presence of

another individual who had previously threatened Jeff Conway would not have bolstered Conway's claim that he shot Williams but did not intend to kill him.

{¶ 57} Conway also argues that his trial counsel failed to reasonably investigate Brian McWhorter, citing the inconsistent statements that McWhorter gave to police. (Appellant's Brief at 28-29.) As discussed in the fourth assignment of error, McWhorter admitted in his direct testimony that he lied during his initial police interviews because he feared repercussions from Conway. Thus, the information in the investigative reports is merely cumulative of information available to Conway's attorneys at trial. Furthermore, the subject matter of McWhorter's direct testimony was available to Conway's attorneys before trial. Prosecutors requested a videotaped deposition of him because they were afraid that he would "flee the state or be eliminated by associates of the defendant prior to trial." (May 21, 2002 Mot.; May 22, 2002 Order.) Thus, Conway's attorneys had the opportunity to depose McWhorter before trial and were aware of the inconsistent statements he made to police before cross-examining him. There is no new evidence to support Conway's assertion that his trial attorneys were deficient in their investigation of McWhorter.

{¶ 58} The remainder of Conway's arguments alleging that his trial counsel failed to conduct a reasonable trial phase investigation refer to the same evidence discussed in the fourth assignment of error. (Appellant's Brief at 29.) Citing several conflicting statements of witnesses, Conway argues that his trial counsel conducted an unreasonable investigation of the identity of the shooter. However, Conway admitted shooting the victims. Thus, it was not unreasonable for his trial counsel to not investigate additional suspects. Conway also points to the evidence that he believes contradicts the state's theory of the case. *Id.* As discussed in the fourth assignment of error, this evidence was not inconsistent with the state's theory of the case, and would not have assisted his defense if his trial attorneys had uncovered it. The same can be said regarding the evidence pertaining to his initial attorney, Christopher Cicero, which was far from exculpatory and, in fact, corroborated the state's allegation that Conway was involved in a conspiracy to murder McWhorter. In short, no new evidence supports the assertion that his trial counsel failed to conduct a reasonable trial phase investigation.

{¶ 59} Conway's second ineffective assistance of counsel argument alleges that his trial counsel unreasonably failed to obtain a ballistic and firearms expert to rebut Trent's

testimony concerning a statement Conway made to him about the penetrating ability of a .45 caliber pistol. He also faults his trial counsel for not calling an ophthalmologist to opine about his poor eyesight. (Appellant's Brief at 32.) Both matters are res judicata. The recent depositions of his trial attorneys that Conway cites to do not demonstrate why these matters could not have been raised in his direct appeal. Furthermore, Trent's statement was addressed in Conway's first postconviction petition. *Conway I* at ¶ 45-47.

{¶ 60} Conway's third argument concerning ineffective assistance of counsel alleges that his trial counsel performed unreasonably during voir dire by failing to address the issue of race and failing to peremptorily strike a juror who was in favor of the death penalty. (Appellant's Brief at 32-34.) These matters are barred by res judicata. The voir dire issue concerning race was raised in the direct appeal and addressed by the Supreme Court of Ohio. *Conway II* at ¶ 170-71. The argument concerning the juror in favor of the death penalty was raised and addressed in Conway's first postconviction motion. *Conway I* at ¶ 51-55.

{¶ 61} The fourth argument Conway raises alleges ineffective assistance of counsel based on his trial attorneys' performance during the state's case in chief. He argues that the attorneys failed to reasonably cross-examine Trent and McWhorter, as well as investigating officers concerning eyewitnesses and Cicero. (Appellant's Brief at 35-37.) However, the issues he raises, such as statements Trent made about his own plea bargain or reasons for testifying, have all been discussed and we have rejected Conway's assertion that they were inconsistent or prejudicial to Conway. He also faults his attorneys for not using the surveillance video from the club. This matter is res judicata, as it was addressed by the Supreme Court of Ohio in Conway's direct appeal. *Conway II* at ¶ 152.

{¶ 62} In his fifth argument to support his claim of ineffective assistance of trial counsel, Conway argues that his attorneys performed unreasonably during the defense case in chief. He cites their failure to have an expert's testimony admitted who had prepared a computer simulation that he believes would have bolstered his claim that he did not aim the gun at Williams with the intent to kill. (Appellant's Brief at 39-40.) This matter is res judicata, as the trial court excluded the expert, the issue was appealed, and the Supreme Court of Ohio affirmed the ruling after an extensive analysis in *Conway II* at ¶ 111-23.

{¶ 63} Conway also faults his trial attorneys' failure to call a witness who would have confirmed that one of the individuals present at the club the night of the shooting had previously assaulted Jeff Conway. (Appellant's Brief at 40.) As discussed previously, a line of inquiry concerning the presence of someone who had previously assaulted his brother was not relevant to the issue of whether Conway fired the gun at Williams with the requisite intent. Conway testified that he saw Williams, believed Williams had stabbed his brother, and aimed the gun in his direction before pulling the trigger. *Conway I* at ¶ 19. For the same reason, his counsel was not ineffective for failing to call eyewitnesses who believed someone other than Conway was the shooter, as he admitted to pulling the trigger. (Appellant's Brief at 41.)

{¶ 64} Conway also argues that he received ineffective assistance of counsel because his attorneys failed to prepare him to testify at trial. He claims that if his attorneys had known that Trent had stated to investigating officers that Conway kept shooting because he knew that the shots from a .45 caliber weapon would pass through Gervais and hit Williams, his attorneys would have advised him not to testify. (Appellant's Brief at 42.)

{¶ 65} We note that there is some controversy as to whether Conway's trial attorneys had notice that Trent had made such a statement. In a deposition conducted on August 9, 2012, Robert Suhr, one of Conway's trial attorneys, claimed that he did not know that Trent was going to make the statement. (Petition Ex. No. 64 at 139-40.) However, in an affidavit attached to the state's memorandum in response to Conway's first petition for postconviction relief, assistant prosecutor Cheryl Pritchard swore that a transcript of an investigative interview with Trent where he made a similar statement was provided to Conway's attorneys in advance of trial. (June 21, 2004 Appx. and Exs. for Respondent's Response, Ex. No. 3.) However, because the issue was raised in Conway's first petition for postconviction relief, the matter is res judicata. *Conway I* at ¶ 45-47.

{¶ 66} He also argues that his trial counsel was ineffective for failing to provide him with audio recordings of his conversation with Trent before he was cross-examined. (Appellant's Brief at 43.) Conway raised this precise issue in his direct appeal and res judicata bars him from raising it here. *Conway II* at ¶ 172-74.

{¶ 67} Finally, Conway argues that his trial counsel performed unreasonably by failing to make a number of objections at trial, including the following: the bailiff

administering the oath to the jury instead of the clerk; a violation of Conway's right to a public trial; the accuracy of the transcripts of Trent's conversations with Conway; Trent's reference to Conway's other pending murder charge; the admission of the testimony of David DeVillers, a former assistant prosecutor; the admission of Benjamin Bechtel's testimony about the victim's background; Conway's exclusion from the jury instruction conference; and the course-of-conduct death penalty specification. (Appellant's Brief at 44.)

{¶ 68} Conway does not explain why an ineffective assistance of counsel claim based on the failure to object to these issues could not have been raised on direct appeal. All of the issues Conway raises were part of the record at the time of the direct appeal. It must be restated that "constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction" is the only appropriate basis for filing a petition for postconviction relief. *State v. Murphy*, 10th Dist. No. 00AP-233 (Dec. 26, 2000), citing *State v. Jackson*, 64 Ohio St.2d 107, 413 (1980). Although Conway's new counsel have quizzed his trial attorneys about their knowledge of the law and reasoning for not objecting to the issues he mentions, these answers do not alter the reality that the failure to object to them was plainly part of the record by the time of the direct appeal. As such, the failure to object to them could have been part of the ineffective assistance of counsel claim Conway made at that time. For this reason, res judicata bars them from being considered in this successive petition. *Steffen* at 410. Moreover, many of the issues that the trial attorneys failed to object to were considered on direct appeal. *See Conway II.*

{¶ 69} Based on the foregoing, we conclude that Conway has failed to demonstrate that he suffered from the ineffective assistance of counsel during the trial phase. The trial court did not err when it dismissed the fifth through eleventh grounds for relief. Accordingly, the fifth assignment of error is overruled.

### F. Sixth Assignment of Error

{¶ 70} In the sixth assignment of error, Conway argues that the trial court erroneously dismissed the twelfth through sixteenth grounds for relief in the petition, all of which alleged that he was denied the effective assistance of counsel during the mitigation

phase of the trial. (Appellant's Brief at 47.) Conway presents the following arguments concerning his attorneys' performance during mitigation.

{¶ 71} First, he argues that his trial attorneys failed to conduct a reasonable investigation before mitigation. (Appellant's Brief at 48-52.) Conway has attached affidavits from a number of his relatives to the petition that he believes his attorneys should have interviewed. (Petition Ex. Nos. 69-71, 78-86.) Conway raised this issue in his first petition for postconviction relief and the matter is res judicata. We stated the following when considering this argument:

> In support of his arguments that defense counsel should have done more to prepare and/or present mitigation evidence, appellant offers numerous affidavits, primarily from family members. As detailed above, however, defense counsel described at length the lack of cooperation from appellant and his family after the jury's guilty verdict, and even counsel's success at persuading appellant to allow the submission of any mitigation evidence. Appellant's submission of different or additional evidence from family members willing to cooperate at the post-conviction proceeding does not overcome the record evidence clearly establishing the diligent preparation by counsel. The pre-trial motions, time records, and trial transcript show that counsel prepared thoroughly, consulted with a mitigation specialist, and were fully engaged on their client's behalf.

*Conway I* at ¶ 39.

{¶ 72} Conway's second argument concerning the performance of his attorneys during mitigation faults them for not presenting a psychologist or cultural expert to testify. (Appellant's Brief at 53-55.) Conway's attorneys did, in fact, retain a psychologist to examine him. However, they made the strategic decision not to call the psychologist as a witness. Both of his attorneys believed that Conway was free from psychological problems. (Petition Ex. No. 63-2 at 54.) Brian Rigg, Conway's trial attorney, was concerned that the psychologist would have been "subject to all types of questions regarding the other bad acts Mr. Conway [had] been accused of" on cross-examination. (Petition Ex. No. 63-2 at 50.) He did not want to have the psychologist prepare a report that he would have had to turn over to the prosecution. (Petition Ex. No. 63-2 at 51.) Rigg was wary of the effect that psychologists have on jurors, who "don't want to be told that this young man or this young

person has had a terrible upbringing and I'm doctor such and such and I know more than you." (Petition Ex. No. 63-2 at 50.)

{¶ 73} The Supreme Court of Ohio has noted that:

> [T]he mere failure to present mitigating evidence at the penalty phase of a capital trial does not itself constitute proof of ineffective assistance of counsel or deprivation of the accused's right to a fair trial. It is conceivable that the omission of such evidence in an appropriate case could be in response to the demands of the accused or the result of a tactical, informed decision by counsel, completely consonant with his duties to represent the accused effectively.

*State v. Johnson*, 24 Ohio St.3d 87, 91 (1986).

{¶ 74} Here, Conway's attorneys made the "tactical, informed decision" not to call a psychologist and risk alienating the jury or exposing their client to damage through the state's cross-examination. *Id.* Conway does not describe what the psychologist's testimony would have revealed, much less identify any mitigating effect such testimony would have had on jurors. Thus, any mitigating effect is purely speculative, as is the allegedly prejudicial effect of his attorneys' decision. For these reasons, his attorneys' decision to not call a psychologist to testify does not support Conway's claim that his attorneys performed ineffectively at mitigation.

{¶ 75} Conway's argument concerning the failure to call a cultural expert as a witness was addressed in our decision denying his first petition for postconviction relief, and is therefore subject to res judicata. *Conway I* at ¶ 40.

{¶ 76} Conway's final arguments concerning mitigation address his attorneys' preparation for and performance at the sentencing hearing. (Appellant's Brief at 55.) He criticizes the trial attorneys for having an "incomplete and an inaccurate perception" of his upbringing because they believed he came from a "good family" and "grew up in an average home." *Id.* However, he acknowledges that the attorneys possessed information about his father's criminal record and other illegal activity that family members had been involved in. *Id.* Thus, Conway's real criticism is with the strategy that his attorneys used at mitigation, which avoided the appearance of blaming his childhood for his actions. As mentioned, Conway's attorneys were wary of the effect such a presentation would have on the jury. We decline to second guess the strategy Conway's attorneys employed at

mitigation. The issue was discussed at length in Conway's first postconviction petition, and Conway has presented no new evidence to demonstrate that his attorneys performed unreasonably. *Conway I* at ¶ 28-44.

{¶ 77} Based on the foregoing, we conclude that Conway has failed to demonstrate that his attorneys performed ineffectively during the mitigation phase of his trial. There are no new facts that he was unavoidably prevented from discovering or evidence of constitutional error that prejudiced him at trial. R.C. 2953.23(A)(1). Accordingly, the trial court did not err when dismissing the twelfth to sixteenth grounds for relief in his successive petition for postconviction relief. The sixth assignment of error is overruled.

### G. Seventh Assignment of Error

{¶ 78} The seventh assignment of error argues that the trial court erred when it dismissed the seventeenth ground for relief, which alleged that the cumulative effect of the prejudice that Conway suffered warranted the grant of a new trial or sentencing hearing. Because Conway has failed to demonstrate prejudice in any of the foregoing assignments of error, this argument is moot. The seventh assignment of error is overruled.

### H. Eighth Assignment of Error

{¶ 79} Conway's eighth assignment of error asserts that the trial court erred by dismissing the eighteenth ground for relief, which was premised on an alleged discovery violation committed by the assistant prosecutors. According to Conway, they withheld a statement by Trent made to detectives that would have given them notice of the statement that Trent made on the stand concerning Conway's admission that he continued firing the .45 caliber pistol after Williams pulled Gervais in front of him because he knew that the bullets would still hit Williams. (Appellant's Brief at 69-71.)

{¶ 80} As discussed in the fifth assignment of error, it is arguable whether this discovery violation actually occurred, as Conway's trial attorney and the assistant prosecutor present conflicting accounts of whether the statement was provided in discovery. However, the matter is res judicata. In our decision affirming the denial of Conway's first postconviction petition, we addressed the state's alleged failure to provide the statement and rejected Conway's characterization of the statement Trent made in the investigative report as equivalent to the statement he made on the stand. *Conway I* at ¶ 45-49. We concluded that the statements were materially dissimilar. Furthermore, we noted

that the alleged discovery violation would be a matter appropriate for Conway to raise in his direct appeal, which had not yet been heard. *Id.* Conway's only new evidence to support this claim is a deposition of his attorney taken five years later that he was not unavoidably prevented from obtaining before his direct appeal. The matter is res judicata and may not be raised in a successive petition. The eighth assignment of error is overruled.

### I. Ninth Assignment of Error

{¶ 81} The ninth assignment of error asserts that the trial court erred by dismissing the nineteenth ground for relief, which asserted that the decision of the United States Supreme Court in *Hurst v. Florida*, 136 S.Ct. 616 (2016), rendered Ohio's death penalty sentencing process unconstitutional. (Appellant's Brief at 70-74.) The Supreme Court of Ohio has held that *Hurst* does not apply to Ohio's death penalty sentencing process, and that the process is consonant with the Sixth Amendment. *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, ¶ 19. We are bound by the holding in *Mason*. Accordingly, the ninth assignment of error is overruled.

### J. Tenth Assignment of Error

{¶ 82} In the tenth assignment of error, Conway argues that the trial court erred by dismissing the twenty-third ground for relief, which asserted that he was denied the effective assistance of counsel in his first petition for postconviction relief. (Appellant's Brief at 75-77.)

{¶ 83} Conway's argument relies on an erroneous premise, as "an indigent petitioner has neither a state nor a federal constitutional right to be represented by an attorney in a postconviction proceeding." *State v. Crowder*, 60 Ohio St.3d 151, 152 (1991). Furthermore, we have previously held that R.C. 2953.21(I)(2) prohibits a petitioner from challenging the effectiveness of counsel received during an initial postconviction proceeding in a successive petition. *State v. Waddy*, 10th Dist. No. 15AP-397, 2016-Ohio-4911, ¶ 45. Accordingly, the tenth assignment of error is overruled.

### K. Eleventh Assignment of Error

{¶ 84} Conway's eleventh assignment of error alleges that the trial court erred by dismissing the twenty-fourth ground for relief, which asserted that his trial and sentencing violated a number of international treaties entered into by the United States, as well as customary international law. (Appellant's Brief at 78-80.)

{¶ 85} Conway provides no explanation for why an argument attacking his conviction with international law could not have been raised in his direct appeal or in his first postconviction petition. Thus, res judicata bars it from forming any grounds for relief in a successive petition. Furthermore, Conway's successive petition has not identified a constitutional violation that he was unavoidably prevented from discovering the grounds for that might serve as the basis for his argument. The trial court did not err in concluding that it lacked jurisdiction under R.C. 2953.23(A)(1) to consider Conway's challenge to his conviction under principles of international law. Accordingly, the eleventh assignment of error is overruled.

### L. Twelfth Assignment of Error

{¶ 86} Conway's twelfth assignment of error, which asserts that the cumulative effect of his purported constitutional violations justifies reversing his conviction under the Eighth and Fourteenth Amendment, has been rendered moot by his failure to demonstrate any constitutional violation that would have granted the trial court jurisdiction under R.C. 2953.23(A)(1) to hear his successive petition. Accordingly, the assignment of error is overruled as moot.

## IV. CONCLUSION

{¶ 87} Based on the foregoing, we conclude that Conway failed to demonstrate that the trial court had jurisdiction under R.C. 2953.23(A)(1) to hear his successive petition for postconviction relief. Thus, the trial court did not err when it dismissed all the grounds for relief and denied the petition. Accordingly, we overrule all twelve assignments of error raised in this appeal and affirm the decision of the trial court.

*Judgment affirmed.*

KLATT, P.J. and TYACK, J., concur.

————————————